Román, J.,
concurs in a separate memorandum as follows: This action is for common-law negligence and violations of Labor Law §§ 200 and 240 (1). Plaintiff, an employee of a nonparty, was injured while working at premises owned by defendant Port Authority of New York and New Jersey (the Port Authority). The premises had been leased by the Port Authority to nonparty United States Post Office, which, for purposes of altering the same, hired plaintiffs employer. On the date of plaintiffs accident, during work performed by one of plaintiffs coworkers, there was a break in a domestic water pipe inside an electrical closet. As plaintiff and one of his coworkers attempted to repair the pipe, a transformer that had been affixed to the wall, at a height of six to seven feet, fell, striking plaintiff in the head. At the time of the accident, plaintiff was standing on the ground, holding the ladder on which his coworker stood.
Weeks before plaintiff’s accident the wall to which the transformer was affixed had been repeatedly exposed to water emanating from pipes that the Port Authority was obligated to repair. The Port Authority was notified about these leaks, and weeks before both plaintiffs accident and the installation of the transformer the leaks were repaired and the wall had dried. The leak that plaintiff and his coworker were attempting to repair, however, caused the wall to which the transformer was affixed to become wet. The Port Authority was notified of the leak and shut off the main water supply, allowing plaintiff and his coworker to attempt a repair of the broken pipe.
The Port Authority’s construction supervisor testified that “[a]ll mains [were to be] repaired by Port Authority. And the branches [all other pipes] are repaired by the tenant.” She also testified that the leak on the date of the accident emanating from a domestic pipe was the Port Authority’s responsibility to repair. When asked whether the water that had fallen on the wall had compromised its strength and integrity, she further testified that once it dried, the wall’s strength “should be the same.”
Labor Law § 240 (1) applies where the work being performed subjects those involved to risks related to elevation differentials (Gordon v Eastern Ry. Supply, 82 NY2d 555, 561 [1993]; Rocovich v Consolidated Edison Co., 78 NY2d 509, 514 [1991]). Specifically, the hazards contemplated by the statute “are those related to the effects of gravity where protective devices are called for . . . because of a difference between the elevation *807 level of the required work and a lower level” (Gordon at 561 [internal quotation marks omitted]). Since Labor Law § 240 (1) is intended to prevent accidents where ladders, scaffolds, or other safety devices provided to a worker prove inadequate to prevent an injury related to the forces of gravity (id.), it applies equally to injuries caused by falling objects and falling workers (Narducci v Manhasset Bay Assoc., 96 NY2d 259, 267-268 [2001]). However, not every accident at a work site means that Labor Law § 240 (1) has been violated (Blake v Neighborhood Hous. Servs. of N.Y. City, 1 NY3d 280, 288 [2003]) inasmuch as not every fall from a scaffold or ladder nor every instance of a falling object constitutes a violation of Labor Law § 240 (1) (Narducci at 267). Thus, a distinction must be made between those accidents caused by the failure to provide a safety device required by Labor Law § 240 (1) and those caused by general hazards specific to a workplace (id. at 268-269). The former give rise to liability under Labor Law § 240 (1), the latter do not (Thompson v St. Charles Condominiums, 303 AD2d 152, 153 [2003], lv dismissed 100 NY2d 556 [2003]).
Since the hazards that Labor Law § 240 (1) is intended to prevent are those that by virtue of height differentials, e.g., work being performed at elevations or loads being hoisted or positioned above a worker, relate to the effects of gravity (see Toefer v Long Is. R.R., 4 NY3d 399, 407 [2005]), there can be no liability under the statute where the work is not being performed at an elevated level (see Misseritti v Mark TV Constr. Co., 86 NY2d 487 [1995]) or where there is no appreciable height differential between a worker and the falling object that strikes him or her (Melo v Consolidated Edison Co. of N.Y., 92 NY2d 909 [1998]; Malecki v Wal-Mart Stores, 222 AD2d 1010 [1995]; Ruiz v 8600 Roll Rd., 190 AD2d 1030 [1993]; cf. Thompson at 154 [plaintiff injured by objects that fell off a collapsing scaffold only four feet high; absence of appreciable height differential not dispositive where accident caused not merely by gravity but also by “absence of, or defect in, a (listed) protective device needed for the job”]).
In denying the Port Authority’s motion for summary judgment dismissing plaintiffs claim under Labor Law § 240 (1) and in granting plaintiff partial summary judgment on that claim, the motion court erred because plaintiff was not working at an elevation and there was no appreciable height differential between plaintiffs head and the falling transformer. The accident occurred when the transformer, mounted six to seven feet off the ground, fell on top of plaintiffs head as he stood on the ground near it. Plaintiff is five feet, eight inches tall, meaning *808 that the distance between his head and the transformer was less than two feet. Nor does Runner v New York Stock Exch., Inc. (13 NY3d 599 [2009]) avail plaintiff. While the Court of Appeals in Runner stated that the relevant inquiry with respect to Labor Law § 240 (1) is “whether the harm flows directly from the application of the force of gravity to the object” (id. at 604), the court first stated that “the single decisive question is whether plaintiffs injuries were the direct consequence of a failure to provide adequate protection against a risk arising from a physically significant elevation differential” (id. at 603 [emphasis added]) and it later stated that “[t]he elevation differential here involved cannot be viewed as de minimis, particularly given the weight of the object and the amount of force it was capable of generating” (id. at 605). Clearly a significant height differential between the work being performed and the object being hoisted or secured continues to be a required element of the statute (Narducci at 269-270).
Under Labor Law § 200, in addition to liability for a dangerous condition arising from the methods employed by a subcontractor, over which the owner or general contractor exercises supervision and/or control, liability can also arise when the accident is caused by a dangerous condition at the work site, that was either created by the owner or general contractor or about which they had prior notice (see Mitchell v New York Univ., 12 AD3d 200, 201 [2004]; Ortega v Puccia, 57 AD3d 54, 61-62 [2008]; Paladino v Society of N.Y Hosp., 307 AD2d 343, 345 [2003]). Similarly, under the common law, no liability lies absent proof that a defendant created the dangerous condition alleged to have caused a plaintiffs accident or unless the defendant has prior actual or constructive notice of the same (Piacquadio v Recine Realty Corp., 84 NY2d 967, 969 [1994]; Bogart v Woolworth Co., 24 NY2d 936, 937 [1969]; Armstrong v Ogden Allied Facility Mgt. Corp., 281 A.D2d 317, 318 [2001]; Wasserstrom v New York City Tr. Auth., 267 AD2d 36, 37 [1999], lv denied 94 NY2d 761 [2000]).
Here, at least three issues of fact preclude summary judgment in the Port Authority’s favor on plaintiffs Labor Law § 200 and common-law claims: whether the leak on the date of the accident was a dangerous condition on the Port Authority’s property that did not arise from the methods used by plaintiffs employer, arising instead from a defect in the pipes; whether the water falling on the wall on the date of the accident emanated from pipes that the Port Authority was obligated to repair and maintain; and whether the water falling on the wall to which the transformer was affixed had so weakened the wall as to contribute to the transformer’s fall.
*809 To the extent that the record evinces that the water leak on the date of plaintiffs accident was emanating from a preexisting domestic pipe, there is a question of fact as to whether the leak arose from the methods employed by plaintiff and his employer or whether the same arose from a dangerous condition on the Port Authority’s premises, e.g., defective pipes. Similarly, because the Port Authority had notice of this leak and through its construction manager testified that it was obligated to repair it, there is a question of fact as to whether the Port Authority breached its duty to the plaintiff in failing to repair it before his accident. Lastly, since at the time of the accident the wall was wet and the Port Authority’s construction manager testified that wet walls have less strength than dry walls, there is a question of fact as to whether the wet wall proximately caused the accident.
Andrias, J.P, and McGuire, J., concur in part and dissent in part in a separate memorandum by McGuire, J.: Plaintiff was standing on the floor holding a ladder for a coworker who was trying to fix a pipe in the ceiling that had been broken earlier that day when another coworker was removing a sink. While plaintiff was holding the ladder, a transformer mounted on the wall at eye level came loose and hit plaintiff in the head. A reasonable inference from the evidence is that the transformer fell when the coworker stepped on it, but what exactly caused the transformer to fall is irrelevant. The transformer had been installed two or three weeks before the accident; the workers who mounted the transformer were standing on the floor when they installed it.
Although Justice Moskowitz is correct that “[t]he protections of section 240 (1) are not limited to circumstances where the falling object was in the process of being hoisted or secured,” “strict liability under section 240 (1) is limited only to risks associated with elevation differentials” and “[n]ot every gravity-related hazard falls within the statute” (Daley v City of New York Metro. Transp. Auth., 277 AD2d 88, 89 [2000], citing Misseritti v Mark IV Constr. Co., 86 NY2d 487, 490-491 [1995]). As the Court of Appeals has explained, “ ‘The contemplated hazards are those related to the effects of gravity where protective devices are called for either because of a difference between the elevation level of the required work and a lower level or a difference between the elevation level where the worker is positioned and the higher level of the materials or load being hoisted or secured’ ” (Toefer v Long Is. R.R., 4 NY3d 399, 407 [2005], quoting Roeovich v Consolidated Edison Co., 78 NY2d 509, 514 [1991]). Where, however, workers or objects fall but *810 the plaintiffs “ ‘w[ere] exposed to the usual and ordinary dangers of a construction site, and not the extraordinary elevation risks envisioned by Labor Law § 24O0 (1),’ the plaintiffis] cannot recover under the statute” (id., quoting Rodriguez v Margaret Tietz Ctr. for Nursing Care, 84 NY2d 841, 843 [1994]).
Thus, for example, the Court of Appeals found the statute inapplicable where the plaintiffs decedent, a mason who was performing work on townhouses being constructed, was severely injured when a completed, concrete-block fire wall collapsed (Misseritti, 86 NY2d at 491). The Court explained that under those circumstances, there was “no showing that the decedent was working at an elevated level at the time of his tragic accident. Nor can it be said that the collapse of a completed fire wall is the type of elevation-related accident that section 240 (1) is intended to guard against” (id.). Similarly, the Court found the statute inapplicable where the plaintiff was removing a steel window frame from a fire-damaged warehouse when a large piece of glass from an adjacent window frame fell and severely cut his arm (Narducci v Manhasset Bay Assoc., 96 NY2d 259, 265-266 [2001]). The Court explained that “the glass that fell on plaintiff was not a material being hoisted or a load that required securing for the purposes of the undertaking at the time it fell, and thus Labor Law § 240 (1) does not apply” (id. at 268) . The Court further explained that “[t]he absence of a necessary hoisting or securing device of the kind enumerated in Labor Law § 240 (1) did not cause the falling glass” (id. at 268-269) . Rather, it “was clearly a general hazard of the workplace” and not one that is subject to the statute (id. at 269).
Likewise, in Capparelli v Zausmer Frisch Assoc. (96 NY2d 259 [2001]), the companion case decided with Narducci, the plaintiff, who was standing on a ladder while installing a light fixture in a 10-foot ceiling, was injured when the light fixture began to fall from the ceiling before he was able to secure it and he cut his hand and wrist (id. at 266-267). The Court noted that although the ceiling was 10 feet high, the plaintiff was standing halfway up an eight-foot ladder when the light fixture fell (id. at 269). It held that under these facts, “there was no height differential between plaintiff and the falling object” since the plaintiff “was working at ceiling level when his accident occurred” (id. at 269-270).
Here, plaintiff was standing on the floor when the transformer, which was installed at eye level and was no more than six or seven feet high, came loose and hit him. There was no elevation differential between plaintiff and the transformer and the transformer was neither an object being hoisted nor a load *811 that required securing at the time it fell. In fact, the transformer was completely unrelated to plaintiffs task of holding the ladder while his coworker worked on a pipe in the ceiling (see Narducci, 96 NY2d at 268).
The relevant facts of this case are indistinguishable from those in Narducci and Capparelli, and summary judgment should have been granted to the Port Authority for this reason alone. Justice Moskowitz all but expressly concedes that Narducci and Capparelli cannot be distinguished, for she contends only that these precedents “predate the Court of Appeals’ expansive reading [of Labor Law § 240 (1)] in Runner.” In essence, then, Justice Moskowitz’s position is that in Runner v New York Stock Exch., Inc. (13 NY3d 599 [2009]) the Court overruled these precedents sub silentio. But nothing in the opinion in Runner suggests that its analysis proceeds down a new and “expansive” path. Moreover, as discussed below, Runner and Narducci are not inconsistent, a circumstance that Justice Moskowitz appears to acknowledge when she first cites Narducci. In any event, one should not leap to the conclusion that Narducci is no longer good law, in the absence of an express statement to that effect by the Court of Appeals.
Summary judgment for the Port Authority should have been granted on the section 240 (1) claim for an independent reason: there is no support in the record for concluding, as Justice Moskowitz does, that the transformer fell because of the absence of one of the enumerated safety devices. The statute requires contractors and owners to “furnish or erect . . . scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices” to provide proper protection to workers engaged in the “erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure” (Labor Law § 240 [1]). This list of required safety devices, “all of which are used in connection with elevation differentials, evinces a clear legislative intent to provide ‘exceptional protection’ for workers against the ‘special hazards’ that arise when the work site either is itself elevated or is positioned below the level where ‘materials or load [are] hoisted or secured’ ” (Ross v Curtis-Palmer Hydro-Elec. Co., 81 NY2d 494, 500-501 [1993], quoting Rocovich, 78 NY2d at 514).
In support of her assertion that “the failure of the bolts [on the water-damaged wall] was the proximate cause of the accident,” Justice Moskowitz concludes that the “anchor bolts” that secured the transformer to the wall are a “safety device” under the statute. Not surprisingly, Justice Moskowitz cites no support for this startling conclusion. To rebut it, I think it is *812 sufficient to note that based on this reasoning, a nail would be a safety device.
This rationale for affirmance is one that will come as a surprise to plaintiff, as well as the Port Authority, for it was conceived and constructed by Justice Moskowitz. Plaintiff certainly does not argue that the bolts that secured the transformer are a “safety device.” Rather, he argues that the lag bolts temporarily secured the transformer to the wall, braces were supposed to provide additional support, and the installation of the braces had not occurred as of the date of the accident. Although plaintiff testified that the lag bolts were temporarily used to secure the transformer to the wall, he subsequently testified that he did not know whether braces, or “a cable or a chain,” were going to be utilized to further secure the transformer. Because “there was no detail” on the print for installation of the transformer, he inquired with the architect, who “sent out a memo for adding knee braces for extra support.” However, the testimony of the architect made clear that at the time of plaintiffs inquiry, it was not yet known that the transformer specified by the electrical engineer was one “that had an integral flange attached to the transformer project and this flange had holes in it that were designed to receive bolts, which were to be anchored to the . . . wall substrate.” Thus, the transformer was installed according to its specifications, the installation was not temporary, and braces were not required.
As for the rationale created by Justice Moskowitz, it cannot be relied on since the Port Authority never had the opportunity to address it (see Misicki v Caradonna, 12 NY3d 511, 519 [2009] [“For us now to decide this appeal on a distinct ground that we winkled out wholly on our own would pose an obvious problem of fair play”]). In any event, the braces referred to are not the type intended by the statute. In Misseritti, the Court of Appeals specifically construed the “braces” referred to in the statute “to mean those used to support elevated work sites not braces designed to shore up or lend support to a completed structure” (86 NY2d at 491). Thus, here, as in Misseritti, the statute is not applicable.
Justice Moskowitz’s reliance on Runner v New York Stock Exch., Inc. (13 NY3d 599 [2009]) is misplaced. In Runner, the plaintiff was assisting coworkers in moving an 800-pound reel of wire down a set of approximately four stairs and was injured when the reel descended and pulled him into a metal bar. Thus, there was a height differential in Runner. More critically, the lack of an enumerated safety device was the proximate cause of the accident. Indeed, the Court of Appeals specifically noted *813 that “[e]xperts testified that a pulley or hoist should have been used to move the reel safely down the stairs” (id. at 602).
With respect to the Labor Law § 200 and common-law negligence claims, where, as here, such claims are based on alleged defects or dangers arising from a contractor’s methods or materials, “liability cannot be imposed on an owner . . . unless it is shown that it exercised some supervisory control over the work” (Hughes v Tishman Constr. Corp., 40 AD3d 305, 306 [2007]). “General supervisory authority is insufficient to constitute supervisory control; it must be demonstrated that the [owner] controlled the manner in which the plaintiff performed his or her work, i.e., how the injury-producing work was performed” (id. [emphasis omitted]). Accordingly, the fact that the Port Authority hired a construction inspector who was present at the site for the purpose of ensuring that the work was in accordance with the preapproved plans and was performed in a safe manner is insufficient to raise a triable issue of fact with respect to whether the Port Authority exercised the requisite degree of supervision and control over the work being performed (id. at 309). Likewise, the fact that the construction inspector had the authority to stop work for safety reasons is insufficient (id.).
Contrary to the assertions of Justices Román and Moskowitz, there is no evidence that prior water leaks damaged the wall, creating a dangerous condition that caused plaintiffs accident. To be sure, there is evidence of prior leaks. But there is no evidence at all that these leaks affected the masonry wall to which the transformer was affixed. Moreover, it is undisputed that the wall was dry when the transformer was installed, and that on the day of the accident the wall was dry prior to the rupture of the water pipe.
Once again, the ground for affirmance is based on a rationale conceived and constructed by justices of this Court and not by the party urging that we affirm. Plaintiff does not argue that there are questions of fact regarding whether there was a “dangerous condition on the Port Authority’s property that did not arise from the methods plaintiff’s employer used” or whether “the water falling on the wall that day emanated from pipes the Port Authority was responsible for or had assumed the responsibility to repair.” Rather, plaintiff argues that the Port Authority is not an out-of-possession landowner that relinquished its authority to supervise and control the work being performed. To the extent that plaintiff argues on appeal that the motion court correctly found that the Port Authority failed to prove that its own “negligence in repairing or failing to *814 repair the water leaks was not a contributing cause of the accident,” he as well as Justices Moskowitz and Román ignore that there is no evidence of any problems with the wall or the installation of the transformer prior to the rupture of the pipe on the day of the accident. Thus, although the Port Authority had notice of prior leaks, it had no notice that the wall was damaged. Indeed, nothing but pure speculation supports the notion that the wall had been damaged by prior leaks. Moreover, the Port Authority had no notice of the specific leak that plaintiffs coworker was trying to fix just before the accident occurred, and there is no evidence that the prior leaks were caused by anything like what caused the latter leak.
Moskowitz and Freedman, JJ., concur in part and dissent in part in a separate memorandum by Moskowitz, J. In this Labor Law § 240 (1) and § 200 case, plaintiff, a site supervisor for the general contractor, was injured when a transformer, that had been temporarily secured directly to sheetrock at a height of six or seven feet, fell on his head. On the day of the accident, a flood occurred in the area of the accident when the general contractor broke a water line while removing a sink. Plaintiff was holding the base of a ladder for a 200-to-240-pound coworker who was taking out a section of pipe in the ceiling. The coworker may have had one foot on the ladder and the other on the transformer, rather than both feet on the ladder. Or, the ladder may have struck the transformer. Nevertheless, while plaintiff was holding the ladder, the transformer’s anchors came loose from the wet sheetrock and the transformer struck plaintiff on the head. The record demonstrates that only lag bolts secured the transformer box to the wall. There is evidence in the record that knee braces were supposed to have been installed to provide additional support, but this installation had not occurred as of the date of the accident. In the weeks leading up to this incident, the wall on which the transformer was mounted had frequently become wet from leaking water. Plaintiff had complained about the leaks and defendant Port Authority, the premises’ owner, had repaired them.
Labor Law § 240 (1) requires contractors and owners to: “furnish or erect, or cause to be furnished or erected . . . , scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to [workers on the premises].” The statute does not cover the type of ordinary and usual perils to which a worker is commonly exposed at a construction site (see Ross v Curtis-Palmer HydroElec. Co., 81 NY2d 494, 501 [1993]). Rather, the statute requires *815 the use of safety devices when not using them creates a direct risk from an elevation differential (see Buckley v Columbia Grammar & Preparatory, 44 AD3d 263, 270 [2007], lv denied 10 NY3d 710 [2008]; see also Narducci v Manhasset Bay Assoc., 96 NY2d 259, 267-268 [2001] [section 240 (1) applies “where the falling of an object is related to a significant risk inherent in the relative elevation at which materials or loads must be positioned or secured” (internal quotation marks and ellipses omitted)]).
The protections of section 240 (1) are not limited to circumstances where the falling object was in the process of being hoisted or secured (see Boyle v 42nd St. Dev. Project, Inc., 38 AD3d 404, 406 [2007]). Rather, “ ‘Labor Law § 240 (1) was designed to prevent those types of accidents in which the scaffold, hoist, stay, ladder or other protective device proved inadequate to shield the injured worker from harm directly flowing from the application of the force of gravity to an object or person’ ” (Runner v New York Stock Exch., Inc., 13 NY3d 599, 604 [2009] [emphasis omitted], quoting Ross, 81 NY2d at 501). In cases of falling objects, the question is “whether the harm flows directly from the application of the force of gravity to the object” (id.). That the transformer fell only a few feet is of no moment.
What is important is whether the injury was a direct consequence of defendants’ failure to provide and place the necessary safety devices the statute mandates under the circumstances (see id. at 604, 605; Thompson v St. Charles Condominiums, 303 AD2d 152, 154 [2003], lv dismissed 100 NY2d 556 [2003]). Here, anchor bolts secured the transformer. It is undisputed that these bolts supporting the transformer did not hold, perhaps due to the water-damaged wall, and that the failure of the bolts was the proximate cause of the accident. Accordingly, the accident fell within the parameters of Labor Law § 240 (1) because a falling object struck plaintiff that a safety device had not adequately secured (see Runner at 604, see also Gallagher v New York Post, 14 NY3d 83 [2010]).
The Port Authority argues that the motion court improperly concluded that the failure of the support bolts on the water-weakened wall caused the accident. Instead, the Port Authority argues that it is likely that the 200-to-240-pound, six-foot-tall coworker stood on the transformer and caused it to fall. However, the electrician who installed the transformer testified that he used bolt expansions with lag bolts that should have been able to support 400 to 500 pounds. Thus, if these bolts were sufficient, the 200-to-240-pound coworker should have been able to place his full weight on the top of the transformer. *816 Moreover, there is no evidence in the record whatsoever that the coworker fell when the transformer’s supporting lag bolts failed. This leads to the inescapable conclusion that the coworker could not have been standing full weight on the transformer when it fell. But, even if the coworker were standing on the transformer, and somehow did not fall, it is irrelevant. This is because the proximate cause of the accident was not a worker standing on the transformer, but the failure of the bolts on the water-damaged wall.
Justice McGuire’s reliance on Misseritti v Mark TV Constr. Co. (86 NY2d 487 [1995]) is not persuasive. He relies on this case to conclude that there is no support in the record that the transformer fell because of the absence of enumerated safety devices. According to Justice McGuire, Misseritti stands for the proposition that the braces the statute refers to are not those that would have been necessary to secure installation of the transformer.
Justice McGuire reads the statute too narrowly, an approach that the Court of Appeals criticized in Runner (13 NY3d at 603 [“The breadth of the statute’s protection has, however, been construed to be less wide than its text would indicate”]). The situation in Runner is instructive. There, the plaintiff and some coworkers were moving an 800-pound reel of wire down a flight of stairs. To prevent the reel from rolling, the workers tied one end of a 10-foot length of rope to the reel and then wrapped the rope around a metal bar. They then placed this metal bar across the door jamb on the same level as the reel. The plaintiff and two others held the loose end of the rope while two other workers began to move the reel down the stairs. As the reel descended, it pulled the plaintiff toward the metal bar. The plaintiff injured his hands against the metal bar.
The Court of Appeals allowed recovery under section 240 (1), even though an object did not strike plaintiff and even though the workers were not hoisting or securing the object from above. To the Court, the Labor Law applies to those types of accidents where the safety device was inadequate to protect the worker and the harm flowed directly from the force of gravity to an object or person. Thus, the operation of the force of gravity in causing the accident was the critical factor. This case fits squarely within the Runner criteria: (1) the safety device (i.e., the anchor bolts) were not sufficient to support the transformer; and (2) the force of gravity caused the transformer to fall on plaintiff. The decisions the Port Authority rely on are no longer viable because they predate the Court of Appeals’ expansive reading in Runner (compare Narducci v Manhasset Bay Assoc., *817 96 NY2d 259, 270 [2001] [“The fact that gravity worked upon this object which caused plaintiffs injury is insufficient to support a section 240 (1) claim”], with Runner, 13 NY3d at 604 [“The relevant inquiry. . . is rather whether the harm flows directly from the application of the force of gravity to the object”]).
Moreover, the list of safety devices in section 240 (1) is not exclusive. The statute specifically contemplates “other devices” necessary to protect workers. Thus, even if MisserittVs construction of “braces” were applicable here, the statute’s language qualifies the knee braces in this case as a safety device, because the knee braces fall under the statute’s category for “other devices” and were necessary to protect plaintiff from having the transformer fall on his head.
With respect to the common-law and section 200 claims, I disagree that this accident necessarily arose out of the manner or methods of the work.
“Cases involving Labor Law § 200 fall into two broad categories: namely, those where workers are injured as a result of dangerous or defective premises conditions at a work site, and those involving the manner in which the work is performed” (Ortega v Puccia, 57 AD3d 54, 61 [2d Dept 2008]). “Where a premises condition is at issue, property owners may be held liable for a violation of Labor Law § 200 if the owner either created the dangerous condition that caused the accident or had actual or constructive notice of the dangerous condition” (id.).
With respect to the common-law and section 200 claims here, the record reveals that before the incident, plaintiff had complained to a Port Authority inspector about wet conditions in the wall where the transformer was located and that the Port Authority repeatedly attempted to fix the leaks. Thus several questions of fact preclude summary judgment in the Port Authority’s favor: whether the water leaks were a dangerous condition on the Port Authority’s property that did not arise from the methods plaintiffs employer used, whether the Port Authority was responsible for the repairs, whether prior leaks affected the sheetrock’s ability to hold up the transformer and whether the water falling on the wall that day emanated from pipes the Port Authority was responsible for or had assumed the responsibility to repair. The evidence in the record is thus sufficient to defeat summary dismissal on the section 200 claims (see Rizzuto v L.A. Wenger Contr. Co., 91 NY2d 343, 353 [1998]). There is no merit to the Port Authority’s arguments that it did not have constructive or actual notice of any defective condition. At the very least, a witness for the Port Authority testified *818 that she was aware that there was a leak in the electrical closet on the morning of the accident. Moreover, the Port Authority’s own construction manager testified that wet walls have less strength than dry walls. This raises a question about whether the prior leaks weakened the wall.